**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**LEXINGTON DIVISION**

**CIVIL ACTION NO. 06-345-JBC**

**MONICA BOWDEN, et al.,**                                                    **PLAINTIFFS,**

**V.**                              **AMENDED MEMORANDUM OPINION AND ORDER**

**DELTA T CORPORATION,**                                              **DEFENDANT.**

* * * * * * * * * *

On November 15, 2006, the court held a telephonic hearing and granted an oral motion for clarification of its previous memorandum opinion and order, also entered on November 15, 2006 (DE 25, 24).  This amended memorandum opinion and order reflects the changes discussed at the hearing.

* * * * * * * * * *

This matter is before the court on the motions of the defendant, Delta T Corporation, to stay the proceedings in this case and to compel arbitration (DE 15, 17).[1]  A hearing on these motions and on the pending motions in a related case, Lexington Civil Action No. 5:06-cv-00357-JBC, was held on November 13, 2006. The court, having considered the record and being otherwise advised, will grant the motion to compel arbitration in part and deny it in part.  The court will also deny as moot the motion to stay the proceedings in this case.

_____

[1] These motions were filed on the same pleading, but they have been docketed separately as DE 15 and DE 17.

I.    **BACKGROUND**

On October 13, 2006, the plaintiffs, Monica Bowden, Sun-North Systems, Ltd. ("Sun-North"), and Envira-North Systems, Ltd. ("Envira-North"),[2] filed a complaint with this court, seeking to enjoin arbitration proceedings commenced by the defendant, Delta T Corporation ("Delta T").  The plaintiffs also sought a declaratory judgment that the alleged arbitration agreement was invalid and unenforceable; that Delta T's claims did not relate to the alleged arbitration agreement; and finally, that they never agreed to arbitrate Delta T's claims.  (DE 1-1 at 7-8.)  According to Delta T, the American Arbitration Association has decided to take no further action on Delta T's claims in arbitration until this suit is resolved.  On October 30, 2006, the court entered an order directing Delta T to file the motion to compel arbitration currently before the court, to which the plaintiffs have replied.

On July 11, 2002, Sun-North entered into a distribution agreement which has given rise to the matter at hand.  (DE 15-3 at 6.)  The agreement was made between Sun-North and HVLS Fan Company ("HVLS"), which was simply another name for Delta T.  Envira-North was not a party to the agreement between Sun-North and HVLS because Envira-North did not exist at the time the distribution agreement was signed, although the plaintiffs have argued that Envira-North's existence was "conceived" as early as 2000.  (Hr'g Tr. at 77.)

---

[2]  Monica Bowden is the CEO of both Sun-North and Envira-North.

2

In the distribution agreement, HVLS appointed Sun-North to be the exclusive Canadian distributor of its high-volume low-speed fans. Among the provisions of this agreement was an arbitration clause, which stated that "[a]ny controversy or claim arising out of or related to this Agreement or the breach thereof shall be settled by arbitration, in accordance with the Rules of the American Arbitration Association, and judgment upon the award rendered by the arbitrator may be entered into any court having jurisdiction thereof." (DE 15-3 at 5.) Delta T argues that the broad federal policy in favor of arbitration, coupled with this broad arbitration clause, provides sufficient justification to stay the current action and compel arbitration.

The distribution agreement between Delta T and Sun-North was short-lived. On March 27, 2003, Monica Bowden faxed a letter on behalf of Sun-North to Carey Smith, the CEO of both HVLS and Delta T. In this letter, she stated Sun-North's intent to terminate the distribution agreement with thirty days' notice, in accordance with the terms of the distribution agreement. (DE 20-2 at 14.) On April 1, 2003, Carey Smith replied to this letter on behalf of Delta T, acknowledging Sun-North's "right to terminate [the] relationship" but claiming that Sun-North's "obligation to maintain our trade secrets survives the agreement . . . ." (DE 20-2 at 16, 18.)

Slightly over a month before Sun-North sent notice of its intent to terminate the distribution agreement with Delta T, Envira-North was incorporated in Canada

3

on February 3, 2003.  Monica Bowden was and remains the CEO of both Sun-North and Envira-North.  Dan Lambert was and remains the sole shareholder of both Sun-North and Envira-North.  Shortly after its creation in early 2003, Envira-North entered the high-volume low-speed fan business as a distributor for an entity known as Macro Air.  In July 2005, Envira-North terminated its relationship with Macro Air, and in 2006 Envira-North began manufacturing its own high-volume low-speed Altra-Air ceiling fans.  (Hr'g Tr. at 99-100.)  During the hearing before the court, Monica Bowden admitted that Envira-North was formed, at least in part, to continue and to shield from liability the fan business previously conducted by Sun-North.  *Id.* at 78-79.

In its demand for arbitration, Delta T alleges that "Sun-North established Envira-North after it executed [the distribution agreement] . . . [and] transferred the operations covered by that agreement over to Envira-North."  (DE 15-7 at 2.)  Delta T also alleges that the plaintiffs have infringed its Canadian patents by manufacturing and selling their own high-volume low-speed fans.  For this alleged infringement, Delta T seeks damages, profits, "delivery-up of infringing goods," injunctive relief, and costs.  *Id.*  In its demand for arbitration, Delta T also alleges that the plaintiffs' threat to "disclose information and documentation" about its products to Delta T's remaining distributors constitutes extortion under Kentucky law.  *Id.*  In the hearing before this court on November 13, 2006, Delta T also stated that it intends to add a claim in arbitration against the plaintiffs for breach of

4

contract.

Delta T's demand for arbitration identifies a single respondent, "Monica Bowden, CEO Sun-North Systems, Ltd. and Envira-North Systems, Ltd." (DE 15-7 at 1), but Delta T's answer to the plaintiffs' complaint in this matter states that Delta T "is not seeking to arbitrate any claims against Monica Bowden . . . ." (DE 13 at 3.)  In the hearing on November 13, 2006, Delta T indicated that the first entry on its demand for arbitration was a typographical error, and that its demand for arbitration and its motion to compel should be restricted to Sun-North and Envira-North.  Delta T will be bound by its concession, and insofar as its pending motion may be read as seeking to compel Monica Bowden to arbitration, that motion is denied.

"[T]he first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985).  More specifically, the court has four tasks when it considers motions to stay proceedings and to compel arbitration:

> first, it must determine whether the parties agreed to arbitrate; second, it must determine the scope of that agreement; third, if federal statutory claims are asserted, it must consider whether . . . those claims [are] nonarbitrable; and fourth, if the court determines that some, but not all, of the claims in the action are subject to arbitration, it must determine whether to stay the remainder of the proceedings pending arbitration.

*Stout v. J.D. Byrider*, 228 F.3d 709, 714 (6th Cir. 2000).  In this matter, the court

5

must determine whether Envira-North is bound by Sun-North's previous agreement to arbitrate, then determine whether Sun-North agreed to arbitrate the issues at hand after the termination of the agreement, and then, if necessary, determine the scope of the arbitration agreement.  Because this matter does not involve nonarbitrable federal statutory claims, and because this action was brought by the plaintiffs to enjoin Delta T's attempt to arbitrate, making a further stay of this case unnecessary, the court will not address these last two issues; rather, the court will strike this case from the active docket.  The issue of a stay in the related case, Lexington Civil Action No. 5:06-cv-00357-JBC, will be discussed in the court's separate order resolving the pending motions in that case.

The court's analysis begins with the contract in question.  In general, "as with any other contract, the parties' intentions control, but those intentions are generously construed as to issues of arbitrability" because the Federal Arbitration Act "'establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or [a] . . . defense to arbitrability.'"  *Soler Chrysler-Plymouth*, 473 U.S. at 626 (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983)).

## II.   ANALYSIS

The plaintiffs offer several responses to Delta T's motion to stay and motion to compel arbitration of its claims against Sun-North and Envira-North.  First, they

argue that Envira-North is not bound by the arbitration clause because Envira-North was not a party to the distribution agreement between Sun-North and HVLS. Therefore, the plaintiffs conclude that Delta T's claims against Envira-North are not arbitrable.  Second, the plaintiffs assert that Delta T's claims are based on actions allegedly taken over three years after the termination of the distribution agreement, and they argue that neither the distribution agreement generally nor the arbitration clause specifically vested any rights in Delta T that survived the agreement's termination.  Therefore, the plaintiffs conclude that none of Delta T's claims are arbitrable.  Third, and in the alternative, the plaintiffs argue that even if the arbitration clause did not expire with the distribution agreement, Delta T's claims are beyond the scope of the parties' arbitration agreement.  These issues will be addressed immediately below.

**A.)   Envira-North's Relation to the Arbitration Agreement**

A non-signatory to an arbitration agreement may be bound by the arbitration agreement when "ordinary contract and agency principles" apply.  *Arnold v. Arnold Corp.*, 920 F.2d 1269, 1281 (6th Cir. 1990); *see also Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 7 F.3d 1110, 1122 (3d Cir. 1993) (stating that "[i]n keeping with the federal policy favoring arbitration," the Third Circuit "share[s] the views of the Courts of Appeals for the Sixth and Ninth Circuits and will extend the scope of the arbitration clauses to agents of the party who signed the agreements").  Delta T suggests that traditional principles of successor-in-interest

7

liability may bind Envira-North to the arbitration agreement entered into by Sun-North.

To support this argument, Delta T claims that Sun-North and Envira-North share the same CEO, the same ownership, and many of the same employees. Delta T also claims that although "Sun-North transferred [its] sales of HVLS fans to Envira-North once Envira-North began its operations . . . ., the actual distribution process remained the same, only that process now operates under the Envira-North name." (DE 15-2 at 8.) Essentially, Delta T argues that Sun-North set up Envira-North in order to escape its obligations under the distribution agreement, including the arbitration clause, and Delta T urges this court not to condone this "subterfuge." *Id.* Given the continuity of personnel and operations between Sun-North and Envira-North, Delta T concludes that the court can "easily determine that the claims against Envira-North bear such a factual relationship to the Sun-North claims that the arbitration agreement applies." *Id.* at 9. In the alternative, Delta T argues that the court "could not conclude otherwise without at least allowing discovery into the relationship between the two." *Id.*

The general rule is that a purchasing (or successor) corporation cannot be held responsible for the debts and liabilities of a selling (or predecessor) corporation. *Pearson v. Nat'l Feeding Sys., Inc.*, 90 S.W.3d 46, 49 (Ky. 2002); *see also Schumacher v. Richards Shear Co.*, 451 N.E.2d 195, 198 (N.Y. 1983) (stating that "[i]t is the general rule that a corporation which acquires the assets of another is

8

not liable for the torts of its predecessor"). This general rule has four exceptions: first, a corporation may be liable for the debts and liabilities of its predecessor if it agrees to assume such debts or liabilities; second, a corporation may be liable along with its predecessor if it merged or consolidated with its predecessor; third, a corporation may be liable along with its predecessor if it is a mere continuance of its predecessor; and fourth, a corporation may be liable along with its predecessor if it received its predecessor's assets in a fraudulent attempt to escape liability. *Pearson*, 90 S.W.3d at 49; *Schumacher*, 451 N.E. at 198.

Delta T argues that Envira-North can be compelled to arbitration as a "mere continuance" of Sun-North, even though Sun-North continues to exist, based on the authority of *Trimper v. Bruno-Sherman Corp.*, 436 F. Supp. 349, 350 (E.D. Mich. 1977), a vicarious-liability case that relied upon "[t]he expansive nature of liability concepts in products liability cases in Michigan[,]" and *Greater Potater Harborplace, Inc. v. Jenkins*, 935 F.2d 267 (Table) (4th Cir. 1991), an unpublished opinion. Despite these authorities, the plaintiffs are generally correct that a successor corporation such as Envira-North cannot be deemed a "mere continuance" of a predecessor such as Sun-North so long as the predecessor exists, even though Envira-North and Sun-North continue to share a near-perfect identity of directors, officers, and shareholders. *See, e.g.*, *Ladjevardian v. Laidlaw-Coggeshall, Inc.*, 431 F. Supp. 834, 839 (S.D.N.Y. 1977) (stating that a mere continuation "envisions a common identity of directors, stockholders, and the existence of only one

9

corporation at the completion of the transfer").  At best, Delta T has asked this

court to extend the theory of "mere continuance" liability and arbitrability beyond

its usual boundaries based on very slight authority.  Contrary to the plaintiffs'

suggestions, however, Delta T has also argued that Envira-North should be

compelled to arbitration because Envira-North's operation and very existence are

part of a "subterfuge" designed to evade Sun-North's continuing obligations under

the terminated distribution agreement.  In essence, Delta T has also argued that

Envira-North is an exception to the general rule against corporate successor liability

because it was created in a fraudulent attempt to evade Sun-North's responsibilities

and potential liabilities.  This theory is not barred by Sun-North's continued

existence.

Under Kentucky law, "[a] careful consideration of the facts" is required to

resolve similar successor-in-liability claims lying between theories of "mere

continuation" and constructive fraud.  *Am. Ry. Express Co. v. Commonwealth*, 228

S.W. 433, 437, 440-41 (Ky. 1920).  At the same time, however, "[b]efore

compelling an unwilling party to arbitrate," the court can only engage "in a limited

review to determine whether the dispute is arbitrable" between two parties.

*Javitch v. First Union Sec., Inc.*, 315 F.3d 619, 624 (6th Cir. 2003); *see also Fazio*

*v. Lehman Bros., Inc.*, 340 F.3d 386, 398 (6th Cir. 2003) (emphasizing the

"*limited*" nature of the court's review in determining whether "a valid agreement to

arbitrate exists between the parties").  Of course, the court may not consider the

10

merits of any claim in deciding whether to order arbitration. *AT&T Tech., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649-50 (1986).

Based on just such a limited, careful review of the facts available at this time, the court will compel Envira-North to arbitration. In her testimony before the court, Monica Bowden admitted that Envira-North started running Sun-North's high-volume low-speed fan business when Sun-North terminated the distribution agreement with Delta T, with "[n]o overlap"; that the fan business was transferred to Envira-North to shield Sun-North from liability, at least in part; that Envira-North was an effective vehicle in this regard because "[t]here were no assets in Envira-North" when it was incorporated; that Envira-North and Sun-North share the same ownership, director, officers, and mailing address; and finally, that until early in 2006, Envira-North and Sun-North also shared the same payroll. (Hr'g Tr. at 80, 79, 80-82.) Moreover, as recently as November 13, 2006, Envira-North's own website described Envira-North's genesis thusly: "[i]n 2003 an opportunity arose" for Sun-North with respect to ceiling fans, and therefore, "Envira-North was formed to distribute both the ceiling fans" and an environmental control, which, until recently, was still in the testing stage. (Delta T's Ex. A.)

The court recognizes that in general, a party has "no obligation to arbitrate issues which it has not agreed to arbitrate," and that therefore, a party "cannot be compelled to arbitrate if an arbitration clause does not bind it at all." *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 547 (1964). But the court also recognizes

11

that if Envira-North is not compelled to arbitration, then Delta T may be unable to recover from Sun-North on the claims it has raised and intends to raise in arbitration, even if those claims are well-founded.  Furthermore, the court finds, based on its limited but fact-intensive review, that Delta T has presented significant evidence to support its theories of successor-in-interest liability with respect to Envira-North, evidence which more than satisfies the generous standard in favor of arbitrability.  The court also finds that failing to compel Envira-North to arbitration on the facts available at this point might undermine the federal policy in favor of arbitration, regardless of the merits of Delta T's claim, by creating an apparent loophole for otherwise binding arbitration agreements related to trade secrets and intellectual property.  Accordingly, the court will compel Envira-North to arbitration.

**B.)    The Duration of the Arbitration Agreement**

"That a broadly worded arbitration clause may reach conduct that occurs after the termination of the contract in which the arbitration clause was embedded, is a well established proposition." *Berkery v. Cross Country Bank*, 256 F. Supp. 2d 359, 368 n.8 (E.D. Pa. 2003) (citing, inter alia, *Nolde Bros., Inc. v. Local No. 358, Bakery & Confectionary Workers Union*, 430 U.S. 243, 245-53 (1977)).  In general, the presumption in favor of arbitration is so strong that "the failure to exclude from arbitrability contract disputes arising after termination, far from manifesting an intent to have arbitration obligations cease with the agreement," usually "affords a basis for concluding that [the parties] intended to arbitrate all

12

grievances arising out of the contractual relationship." *Nolde Bros.*, 430 U.S. at 255.

Despite this strong general presumption, the plaintiffs argue that Delta T's claims are not arbitrable because they are based on actions taken more than three years after the termination of the distribution agreement and the arbitration clause, and because neither the distribution agreement nor the arbitration clause created any continuing rights or duties that survived their termination.  By Monica Bowden's own admission, however, Envira-North was incorporated on February 3, 2003, over one month before she sent Delta T notice of Sun-North's intent to terminate the distribution agreement.  (DE 20-2 at 3.)  Thus, it would seem that Delta T's claims in arbitration are based, at least in part, on actions taken before the termination of the distribution agreement.  Moreover, the clear language of the distribution agreement contradicts the plaintiffs' claim that the agreement did not create any enduring rights: in the agreement, Sun-North agreed "to do nothing at any time, *during or after the term of this Agreement*, which could adversely affet the validity or enforceability" of Delta T's intellectual property.  (DE 15-3 at 4 (emphasis added).)  Because the parties' clear language created continuing rights and duties related to Delta T's arbitration claims, the termination of the distribution agreement does not affect the arbitrability of Delta T's claims.

**C.)    The Scope of the Arbitration Agreement**

According to the distribution agreement,

> "[e]ach party acknowledges that any trade secrets, including, but not limited to, customer information and Product design information, know-how, and technology obtained from the other party is he [sic] exclusive property of the other party and is not to be used or disclosed without express written consent of the other party."

(DE 15-3 at 4.)  Despite the presence of this clause, the plaintiffs argue that Delta T's claims of patent infringement and extortion do not "touch" the underlying distribution agreement.  When pending claims for arbitration "relate to a separate tort action concerning which the trier of fact need not consult the terms of the contract to determine an appropriate remedy[,]" courts have held that they are "not covered by an arbitration clause . . . [because] the determination of the tort claim would not require interpretation of the agreement." *Denali Flavors, Inc. v. Marigold Foods, L.L.C.*, 214 F. Supp. 2d 784, 786-87 (W.D. Mich. 2002) (citing *Tracer Research v. Nat'l Envtl. Servs. Co.*, 42 F.3d 1292, 1294-95 (9th Cir. 1994)).  The plaintiffs argue that Delta T's patent infringement and extortion claims are beyond the scope of the arbitration clause because the claims could be maintained without the distribution agreement, and because a fact-finder could resolve these claims without consulting the distribution agreement.

The merits of this argument are foreclosed to the court, however, because the distribution agreement also provides that "[a]ny controversy or claim arising out of or related to this Agreement or the breach thereof shall be settled by arbitration, in accordance with the Rules of the American Arbitration Association . . . ." (DE 15-3 at 5.)  When parties contract to settle claims related to a contract

14

"according to the rules of the American Arbitration Association[,]" they provide a "'clear and unmistakeable' delegation of scope-determining authority to an arbitrator" because the Rules of the American Arbitration Association provide "that the arbitrator shall have the power to rule on . . . any objections with respect to the . . . scope . . . of the arbitration agreement." *E.g.*, *Sleeper Farms v. Agway, Inc.*, 211 F. Supp. 2d 197, 200 (D. Me. 2002) (quoting *Brandon, Jones, Sandall, Zeide, Kohn, Chalal & Musso, P.A. v. Medpartners, Inc.*, 203 F.R.D. 677, 685 (S.D. Fla. 2001)) (other internal citations omitted); *see also Contec Corp. v. Remote Solution*, 398 F.3d 205, 208 (2d Cir. 2005) (stating that when parties agree to arbitrate "in accordance with the Commercial Arbitration Rules of the American Arbitration Association[,]" that agreement "serves as clear and unmistakeable evidence of the parties' intent to delegate" issues of scope and validity to the arbitrator).

The plaintiffs stoutly maintain that the Sixth Circuit has announced a different rule, largely relying on the opinion cited above in *Stout v. J.D. Byrider*.  In *Stout*, the agreement in question specified that the arbitration in question was "to be conducted through the American Arbitration Association[,]" 228 F.3d at 713, and the court recognized that "the arbitration agreements clearly specify the established organization whose rules will govern the arbitration[,]" 228 F.3d at 715.  Nevertheless, according to the plaintiffs, the Sixth Circuit panel in *Stout* suggested that the scope of the arbitration agreement was a threshold matter for the court, not the arbitrator.

15

The court believes that the plaintiffs' interpretation makes too much of the *Stout* opinion.  In *Stout*, the Sixth Circuit affirmed a district court's decision to compel arbitration under the abuse-of-discretion standard and reiterated the general tasks which face a district court when it considers a motion to compel arbitration. 228 F.3d at 714-718.  Most of the *Stout* opinion focuses, as does this order, on whether the parties agreed to arbitrate.  There is no suggestion, express or implied, that the Sixth Circuit panel in *Stout* ever rejected or even considered the general rule, stated above, that when parties contract to settle claims according to the rules of the American Arbitration Association, they provide a clear and unmistakeable delegation of scope-determining authority to an arbitrator.[3]  Therefore, the court will reject what it believes to be the plaintiffs' strained interpretation of *Stout* and apply the general rule.  Accordingly,

**IT IS ORDERED** that the motion to compel arbitration is **GRANTED** with respect to the plaintiffs Sun-North and Envira-North (DE 15, 17).

**IT IS FURTHER ORDERED** that the motion to compel is **DENIED** with respect to the plaintiff Monica Bowden (DE 15, 17).

**IT IS FURTHER ORDERED** that the motion to stay is **DENIED** as **MOOT** (DE 15, 17).

---

[3]  Furthermore, the court notes that the cases it has relied upon for this general rule all postdate *Stout*.  The court also notes that none of these later cases mentions *Stout*, nor does any suggest that authorities have split on this issue.

Thus, the court has found no basis, in *Stout* or in subsequent case law, for the plaintiffs' suggestion that the Sixth Circuit has departed from this general rule, either intentionally or inadvertently.

16

**IT IS FURTHER ORDERED** that this case is **STRICKEN** from the court's active docket.

Signed on November 27, 2006

*Jennifer B. Coffman*

JENNIFER B. COFFMAN, JUDGE
U.S. DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY